# THE KEY CITY.

1. While courts of admiralty are not governed by any statute of limitations, they adopt the principle that laches or delay in the judicial enforcement of maritime liens, will, under proper circumstances, constitute a valid defence.

2. No arbitrary or fixed period of time has been, or will be established, as an inflexible rule; but the delay which will defeat such a suit must, in every case, depend on the peculiar equitable circumstances of that case.

3. When an admiralty lien is to be enforced to the detriment of a purchaser for value, without notice of the lien, the defence will be held valid under shorter time, and a more rigid scrutiny of the delay than when the claimant is the party who owned the property when the lien accrued.

4. When two corporations united their vessels and other property used in navigation, and formed a new corporation, in which no money was paid by either party, and in the contract of consolidation made arrangements for the payment of the debts of one or both before any dividends should be declared in the new stock, the new corporation cannot avail itself of the doctrine applicable to such a purchaser without notice; and a lien, three years and a half old, will be enforced against one of the vessels so transferred to the new corporation.

APPEAL from the Circuit Court for the Eastern District of Wisconsin; the case being thus:

Young shipped a quantity of wheat on the steamboat Key City, a vessel owned by a corporation called the Northwestern Packet Company, which had this and several other steamboats engaged in the navigation of the Upper Mississippi River. The cargo was lost, and so never delivered. At the time when the shipment was made and the cargo lost on the Key City, there was engaged in the same business in the same waters with the Northwestern Packet Company, a rival corporation known as the La Crosse and Minnesota Steam Packet Company.

After the loss of the wheat, these two companies united their stock in trade, their steamboats, barges, and other property, and formed a new corporation, the corporators of which were taken exclusively from those in the two old companies; and to the new corporation they gave the name of the Northwestern Union Packet Company. To this company all the property of the two other companies was transferred by appropriate instruments. Whether at the time of this union and transfer the La Crosse and Minnesota Company owed debts or not, or what became of them, did not appear. But it did appear that the Northwestern Company, the original owner of the Key City, was largely indebted, and that this was well known to all the parties. Not only was it well known, but provision was made for the payment of the debts generally of that company by the newly formed company out of a fund to come within its control. The nature of that provision was this: certificates of stock of the value of the boats, barges, and other property of the Northwestern

Company merged in the new company were issued, but on their face they recited that no dividends would be paid on such stock until the debts of the Northwestern Company should be paid out of the proportion of the net profits which the shareholders of that company would otherwise be entitled to.

In this state of things, Young, *three years and a half after the wheat was lost, and his cause of action had accrued,* filed a libel in admiralty against the Key City for its failure to perform its contract of affreightment. The Northwestern Union Packet Company, that is to say, the new corporation, appeared as claimants, and set up as a defence that the lien was lost by the lapse of time, to wit, the three years and a half which had intervened between the date when the cause of action accrued and the date of the commencement of the suit; and that defence was sustained by the Circuit Court. The change in the ownership of the vessel during the interval was relied on as strengthening the defence.

*Mr. J. W. Cary, for the appellant:*

1. Professor Parsons* says as follows:

"It has been decided that neither the statute of Anne limiting suits in the English admiralty, nor the statute of limitations of any of our States, is of any force in our admiralty. Whether a claim is to be considered stale or not must depend upon the peculiar circumstances of each particular case, and it is difficult to lay down any general rule. It is, however, we think, evident that a party may have a suit *in personam,* when he cannot sue *in rem;* because in this latter case, the rights of a *bonâ fide* purchaser may intervene. If the vessel remains in the hands of the owners who were in possession at the time the debt accrued, an action may be brought after a considerable lapse of time. But if the vessel has been sold to a *bonâ fide* purchaser, the suit should be brought as soon as an opportunity is presented; and if it is not, a delay is fatal."

The position laid down in this last sentence rests alike on reason and authority.

---

* 2 Maritime Law, 663.

It rests on reason, because admiralty liens are secret; they are not accompanied by possession, and there is no record of them, as in the case of chattel mortgages. It rests equally on authority. In *The Admiral,*\* decided by Sprague, J., a collision occurred October 7th, 1852. The vessel continued for some months plying on her old course, and was then sold to a stock company, and stock in the company given in payment. On a libel being afterwards filed the judge dismissed the libel. He says:

"The rule adopted in courts of admiralty, is to allow the continuance of the lien until a reasonable opportunity is given to enforce it. If a party neglects to avail himself of it, third persons are not to be prejudiced by his delay."

In *The Louisa,*† the libel was for a seaman's wages, and was filed in November, 1845, for wages, commencing in March, 1842, and ending in November after. The vessel in the interim had been sold, and one of the old owners was insolvent. Both the District and Circuit Courts refused to sustain the libel, on the ground " of the long delay to resort to the vessel, and when, in the meantime, the owners had changed and one of them become insolvent."

In *The Buckeye State,*‡ it was held that a delay of three years to enforce a lien by a material-man, was a bar to recovery, and the libel was dismissed for that reason, a third person in the meantime having become the owner of the boat.

In *The Lillie Mills,*§ supplies were furnished in March, June, and October, 1853, and the libel was filed October, 1855; a change of ownership having previously occurred. Sprague, J., says:

" When the rights of third persons have intervened, the lien will be regarded as lost, if the person in whose favor it existed has had a reasonable opportunity to enforce it, and has not done so. This is the well-settled rule in admiralty."

In *The General Jackson,*∥ the supplies were furnished Sep-

---

\* 18 Law Reporter, 91.    † 2 Woodbury & Minot, 48.
‡ 1 Newberry, 111.    § 18 Law Reporter, 494.    ∥ 17 Id. 324.

tember, 1852.   The vessel was sold to the claimant in May, 1854, and the libel filed about eighteen months after supplies furnished.   Sprague, J., says:

"During all that period the vessel was plying between this port and the ports of Maine, as often as once a month, giving the libellant ample opportunity to enforce his claim, had he seen fit, long before the sale of the vessel to the present claimant. It must, therefore, be held that the libellant has waived his lien."

2.  Was there then a *bonâ fide* change of ownership of this particular boat, the Key City, May the 1st, 1866?  Of this there can be no doubt.   Prior to that time the boat was owned by the Northwestern Packet Company; after that it was owned by the Northwestern Union Packet Company, an entirely different corporation, with different stockholders, and holding their interests in different proportions.   There is no pretence that any notice of this lien was given to the new company, or that they ever had any knowledge of it until the marshal took possession of the boat.   The two old companies remained corporations, legal existences, notwithstanding the formation of the new company and the sale to it of this property.   There was no consolidation or legal union of the two.   The old companies remained liable to suit and liable for their debts, and the individual stockholders were also liable if they had appropriated the property of the company.   The property of the Northwestern Packet Company was paid for in stock of the new company, which was a good and valid payment, as much so as if paid in money.   The new company was to pay the debts of the old out of the earnings of the new, in certain proportions, but in no other way.   Dividends were withheld and applied for that purpose.   To allow this suit to prevail would affect the rights, stock, and property of all the stockholders unjustly and inequitably.   The new company cannot be subjected to this proceeding.   The claimant could be compelled to appropriate net earnings belonging to the Northwestern Company or to the stockholders who were of that company, after

a debt had been established. The libellant could have pursued the Northwestern Company, and after judgment its stockholders, for the stock held in the new company.

Does the fact that the stockholders of the Northwestern Company were paid, but in stock of the new company, alter the case? We think not. In *The Admiral*, already cited, and where after the collision the vessel was sold to a stock company, and stock in the company given in payment to the former owners, the court say :

"It is said all the former owners of the Admiral were stockholders in the claimant's company, and that thus the corporation is affected with knowledge of this lien. It does not appear that they owned in the company in the same proportion as before, and if it did, it would make no difference, because there were other stockholders in the company who took in ignorance of the claim, and they ought to be protected. The former owners became merely stockholders in the new company, and their knowledge does not affect the corporation with knowledge. The difficulty is, that as this is a process *in rem*, and the boat the property of the corporation, there is no process to reach the interests of the former owners without affecting the interests of others who purchased innocently. The boat is now owned by a corporation and not by individuals. The persons owning do not own as before any part or rights in the boat, but they own stock in the company."

*Mr. N. J. Emmons, contra:*

The mere conveyance of a vessel, even to an innocent purchaser, without notice, will not of itself necessarily disturb a maritime lien.*

In order to defeat the lien, some other circumstance than mere lapse of time should be made to appear, before the equity, upon which the doctrine is based, can arise.

In *The Batavia*,† Lord Stowell concluded upon the facts proven, that the transfer was merely colorable to avoid payment of certain port charges and duties at Batavia, hence no equity in the purchaser to demand a discharge of the lien.

---

* Sheppard et al. *v.* Taylor et al., 5 Peters, 675.      † 2 Dodson, 500.

In *Willard* v. *Dorr*,[*] while Story, J., passing on the question, says in substance, that courts of admiralty, like courts of equity, will refuse their aid to enforce old, dormant demands, and that it prescribes a rule to itself, by analogy to statutes of limitation, yet enforced a remedy after *twelve years had elapsed;* no equitable circumstance appearing, to bring the case within the rule suggested.

In *The Admiral*, relied on by opposing counsel, stress is laid by the court upon the circumstance that the cause of action was a collision; that the facts were denied, and the witnesses dispersed. The purchasers were without notice, and without ability to contest the claim upon the facts.

In the present case the new company received its conveyance with notice of an existing debt, and covenanted to pay it. The validity of our demand is conceded, and the new company received and still holds a full consideration for what it covenanted. That we could, in equity, compel the performance of such covenant will not be doubted. What consideration arises here—what condition—to demand that our maritime lien be discharged more than would have arisen had the vessel remained in the hands and ownership of the Northwestern Packet Company? The rule, relied on by opposing counsel, exists and is enforced for the protection of innocent purchasers without notice, and as against whom it would be inequitable to decree payment of another's debt, but the rule does not apply. If there be a recovery here, it will be charged in account to the Northwestern Packet Company; and it is not denied that the respondent has an abundant indemnity fund. The fact that dividends were to be retained from the stockholders of the old companies to answer their old debts, is a material feature in this case. No such feature existed in the case of *The Admiral*.

Mr. Justice MILLER delivered the opinion of the court.

The authorities on the subject of lapse of time as a defence to suits for the enforcement of maritime liens are

---

[*] 3 Mason, 91.

carefully and industriously collected in the briefs of counsel on both sides, to which reference is hereby made without specifying them more particularly.

We think that the following propositions as applicable to the case before us may be fairly stated as the result of these authorities.

1. That while the courts of admiralty are not governed in such cases by any statute of limitation, they adopt the principle that laches or delay in the judicial enforcement of maritime liens will, under proper circumstances, constitute a valid defence.

2. That no arbitrary or fixed period of time has been, or will be, established as an inflexible rule, but that the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case.

3. That where the lien is to be enforced to the detriment of a purchaser for value, without notice of the lien, the defence will be held valid under shorter time, and a more rigid scrutiny of the circumstances of the delay, than when the claimant is the owner at the time the lien accrued.

Counsel for the appellees argue that the libel in the present case was rightfully dismissed under this last proposition; and we are of opinion that if the claimants had shown an ordinary case of purchase and payment without notice, the lapse of time would protect them. While on the other hand we are of opinion that if the claimant had been the owner when the lien accrued, it would not be a good defence in this instance.

We must, therefore, inquire into the special circumstances under which the claimant became the owner of the vessel against which the lien is asserted. These show that there was no sale of the property of one of these original corporations to the other, but that they agreed to unite their property and their interests, and for convenience assumed a new corporate name; that in doing this they recognized a large and undefined indebtedness on the part of the Northwestern Company, and provided for its payment out of the earnings otherwise payable to that company. No doubt

these debts were most of them, like the present one, liens on the property of that company, and known to be so by all who united in the transaction. And, finally, that neither the stockholders of the La Crosse and Minnesota Company, nor of the new corporation, have ever parted with or paid any money or other thing of value for the Key City, otherwise than by this consolidation of the companies into one; and it is not apparent, nor even a reasonable presumption, that if the new company has to pay the libellant's debt in this case they will be the losers, but it is nearly certain the loss will fall where it should, on the stockholders coming in through the Northwestern Company.

We do not see, under these circumstances, how the claimants can avail themselves of the rule for the protection of purchasers without notice.

DECREE REVERSED, with directions to enter a decree for libellant for the amount due him for his wheat lost by the Key City,

WITH INTEREST BY WAY OF DAMAGES.